# UNITED STATES DISTRICT COURT



CLERK'S OFFICE
A TRUE COPY
Aug 20, 2021
s/ JeremyHeacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

### EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $405,224.00 IN FUNDS ON DEPOSIT IN
E*TRADE SECURITIES LLC ACCOUNT ENDING
IN 3264 HELD IN THE NAMES OF YUE LIU,
ALSO KNOWN AS TROY LIU, AND JIE YU

Case Number: **21-M-473 (SCD)**

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Park Jones, being duly sworn depose and say:

I am a Special Agent with the Internal Revenue Service, Criminal Investigation Division, and have reason to believe that in the District of New Jersey there is now certain property, namely, up to $405,224.00 in funds on deposit in E*TRADE Securities LLC account ending in 3264 held in the names of Yue Liu, also known as Troy Liu, and Jie Yu, that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) in conjunction with 28 U.S.C. § 2461(c), as property that (1) constitutes or is derived from proceeds traceable to specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343; and (2) was involved in or is traceable to money laundering transactions in violation of 18 U.S.C. § 1957, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

    ✓ Continued on the attached sheet.

    ❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Signature of Affiant
Park Jones, IRS-CI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

8-20-21. 10:00 am
Date and time issued

at Milwaukee, Wisconsin
City and State

Stephen C. Dries, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT**

I, Park Jones, having been duly sworn on oath, state as follows:

## I.    INTRODUCTION

1.      I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation Division ("IRS-CI") and have been so employed since September 2005. As a Special Agent, my responsibilities include the investigation of potential criminal violations of the Internal Revenue Code under Title 26 of the United States Code as well as related Title 18 and Title 31 offenses.

2.      Based on the totality of the facts and circumstances contained in this affidavit, I submit that there exists probable cause to seize monies up to $405,224 in an account x3264 at E*TRADE Securities LLC, which was used by LIU to commit violations of Title 18, United States Code, Sections 1343 and Section 1957 and is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

3.      The facts set forth in this affidavit are based on my own personal knowledge and information gained through my training and experience. During this investigation, I learned additional facts from: other individuals, including other law enforcement officers; interviews of witnesses; and my review of documents and records related to this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a seizure warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## II.    PROPERTY SOUGHT TO BE SEIZED

4.      I submit this affidavit in support of an application for a warrant to seize $405,224 into E*TRADE x3264. Based on the foregoing, I submit there is probable cause to believe that Yue Liu, also known as Troy Liu, (LIU) has engaged in violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1957 (money laundering). I further submit that LIU's deposits totaling $405,224 into E*TRADE x3264 account constitutes a violation of 18 U.S.C. § 1957 in that: (1) the deposits were a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from wire fraud, in violation of 18 U.S.C. § 1343, which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7); and (4) each purchase transaction occurred in the United States.

5.      For these reasons, I submit that there exists probable cause to believe that up to $405,224 in funds on deposit in an account at E*TRADE x3264 are:

   a. subject to civil and criminal forfeiture, under 18 U.S.C. §§ 981(a)(l)(A) and 982(a)(1), as funds involved in or traceable to money laundering offenses, committed in violation of 18 U.S.C. § 1957;
   b. subject to civil and criminal forfeiture, under 18 U.S.C. § 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and 28 U.S.C. § 2461(c), as

property that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343; and

c.  subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(l) and 21 U.S.C. § 853(f).

## III.     PROBABLE CAUSE

6.      I am currently conducting a joint investigation with the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI") focusing on the business and financial activities of Yue Liu, also known as Troy Liu (hereinafter referred to as "LIU"). The investigation and evidence obtained to date has revealed that LIU, through a business he operated and controlled, purported to enroll students from China in what he called a "preferential education program" and serve as research assistants at the University of Wisconsin-Milwaukee ("UWM") while pursuing their Master of Science ("MS") or Doctorate ("PhD") degrees.

7.      LIU is employed as a professor at UWM. According to his online profile page, LIU is a professor in the Department of Civil and Environmental Engineering. His education and professional education is listed as follows:

Education:
- Ph.D., Civil Engineering, Department of Civil and Environmental Engineering, University of Maryland – College Park, USA, 2009
- M.Sc., Transportation Engineering, School of Transport, Tongji University, China, 2004
- B.Sc., Structure Engineering, School of Civil Engineering, Tongji University, China, 2001

Professional Experience:
Aug. 2017 - Present:
  Professor, Department of Civil and Environmental Engineering,
  College of Engineering & Applied Science,
  University of Wisconsin-Milwaukee

Aug. 2014 - Aug. 2017:
  Associate Professor, Department of Civil and Environmental Engineering,
  College of Engineering & Applied Science,
  University of Wisconsin-Milwaukee

Aug. 2009 - Aug. 2014:
  Assistant Professor, Department of Civil Engineering and Mechanics,
  College of Engineering & Applied Science,
  University of Wisconsin-Milwaukee

2

## ENTITIES USED BY LIU IN THE SCHEME

8.       According to Wisconsin Department of Financial Institutions ("DFI") records, on or about April 7, 2016, LIU submitted a Limited Liability Company ("LLC") Articles of Amendment to change the name of an existing LLC established by LIU to UW International Education Foundation LLC ("UWIEF").  The address listed under the contact information was P.O. Box 907, Milwaukee, Wisconsin 53201.  On or about November 17, 2017, LIU submitted another LLC Articles of Amendment to change the name UWIEF to Wisconsin International Education LLC ("WIE"), with its principal office at 2172 W. Saddlebrook Lane in Mequon, Wisconsin.  Based on public records, I am aware that 2172 W. Saddlebrook Lane is Liu's residence.

9.       On or about April 11, 2016, LIU opened a business checking account x3169 at BMO Harris Bank in the name of UW International Foundation LLC ("UWIF").  On or about November 17, 2017, LIU changed the name on account x3169 to WIE.  Since its opening, LIU has been the sole signer on the account.

10.       On or about May 13, 2013, LIU opened an account x6573 at US Bank in the name of Huixin Investment LLC ("Huixin"), an entity established by LIU.  On or about December 1, 2017, LIU changed the name on account x6573 to WIE dba Wisconsin International Education Foundation.  Since its opening, LIU has been the sole signer on the account.

## LIU'S "PREFERABLE EDUCATION PROGRAM"

11.       As a professor at UWM, LIU could sponsor international students to study at UWM.  According to UWM records, the graduate students LIU sponsored generally came over on F-1 non-immigrant visas, for individuals who are full-time students at an accredited college, university, or other academic institution.  The graduate students often held positions as research assistants, assigned to conduct research to benefit both the student and the University.

12.       On or about May 31, 2017, an individual who had applied to UWM as a prospective student received an email from email account wis-international-edu@uwm.edu.  The email stated the following:

Dear [XXXXX],

On behalf of Wisconsin International Education Foundation (WIEF), I am glad to notify you that we have approved your eligibility for the Preferable Education Program for admission to UWM in 2017 fall. Congratulations! All terms and conditions binding the preferable program are listed in the attached offer letter.

Should you have any questions regarding this program, please do not hesitate to contact me at wis-international-edu@uwm.edu. Please indicate your acceptance to be enrolled in this program by signing the letter and returning a scanned copy of the signed letter to me at wis-international-edu@uwm.edu as soon as possible, but not later than June 5, 2017.

3

Again, congratulations and welcome to UWM!

Ian Wyatt

13.     Attached to the email was a .pdf file labeled "program-offer-xxxx."  The file was a 16-page letter.  On the left side of the header section was the UWM banner.  The right side of the header section had a symbol that had the letters "UWI" interwoven with the words "Education Foundation" below it.  The letter had a return address of P.O. Box 907, Milwaukee, Wisconsin 53201. Based on records from the Wisconsin DFI, I am aware that this is the same address used by LIU when submitting to the Wisconsin DFI the name change from UWIEF to WIE.

14.     The opening paragraphs of the letter stated the following:

Dear [XXXXX],

On behalf of Wisconsin International Education Foundation (WIEF), I am glad to notify you that we have approved your eligibility for the *Preferable Education Program* for admission to UWM in 2017 fall.  Congratulations! All terms and conditions binding the preferable program are listed as follows:

**1. Overview:** This preferential program is operated by WIEF. All students applying to UWM must meet the current minimum English proficiency requirements and academic standards set by UWM to be considered for this program. This program offers preferential financial and other benefits for students to pursue their MS or PhD degrees at UWM.

**2. Program Cost:** Your yearly cost for the engineering PhD program is $35,540. You will be offered graduate assistantship stipend of $1,393 per month (before tax, summer recess excluded) by WIEF for a total of $12,540 per year, so your actual cost for study is $23,000 per year.

15.     The additional pages of the letter have information on obtaining a Student Visa, WIEF deputy office bank account, proof of funding requirements, dependent information, and criminal background check information.  The WIEF deputy office bank account provides instructions to the student to deposit the program fee into a Chinese bank account.  The letter is signed by Ian Wyatt – Wisconsin International Education Foundation.

16.     In addition, your affiant has reviewed the .pdf file.  In the comments section of the file, LIU is listed as the author of 7 comments/edits made to the file.

17.     In or about March 2021, UWM administrators confirmed that UWM has never had a "Preferable Education Program" or an employee named Ian Wyatt.  UWM also confirmed that it does not currently have any information regarding email account wis-international-edu@uwm.edu.

4

18.     From on or about April 13, 2016 to on or about April 18, 2016, UWIF account x3169 received three deposits totaling approximately $90,224. The deposits consisted of wire transfers originating from bank accounts in China. The amounts of the wire transfers ranged from $25,088 to $33,568, which are roughly consistent with the cost that LIU was charging students to be included in his "Preferable Education Program" ("PEP"), as indicated in the letter attached to the May 31, 2017 email from wis-international-edu@uwm.edu. The wire instructions for two of the transfers listed the purpose of the transfer was for "graduate tuition" and the other transfer listed "studying fee UWM."

19.     On or about April 19, 2016, LIU issued a check from UWIF account x3169 at BMO Harris Bank in the amount of $90,224 payable to LIU. The check was deposited into US Bank account x5723, which according to US Bank records is LIU's personal checking account. On or about April 29, 2016, LIU conducted an electronic transfer from account x5723 in the amount of $100,000 to a Fidelity brokerage account x9579, which according to Fidelity records is in the name of LIU and his wife. The funds were then used to purchase investments. These funds remained in Fidelity brokerage account x9579 and were used to buy and sell various investments.

20.     In or about April and May 2017, UWIF account x3169 received four deposits totaling approximately $125,507. The deposits were all checks issued from individual bank accounts at JP Morgan Chase and ranged in amounts from $26,840 to $33,587, which are roughly consistent with the cost Liu was charging for his PEP. All the checks list a student ID number and name in the memo line.

21.     On or about May 19, 2017, LIU issued a check from UWIF account x3169 in the amount of $90,000 payable to LIU. The check was deposited into LIU's personal US Bank account x5723. On or about May 24, 2017, LIU conducted an electronic transfer from account x5723 in the amount of $90,000 to OptionsHouse, which is an online options and equity broker owned by E*TRADE. The funds were deposited into E*TRADE account x7119, owned by LIU and his wife, and used to purchase investments. On or about August 31, 2017, E*TRADE merged account x7119 with E*TRADE account x3264.

22.     From in or about June 2017 to in or about August 2017, UWIF account x3169 received three deposits totaling approximately $95,675, consisting of wire transfers that originated from bank accounts in China. The deposit amounts ranged from $30,552 to $33,558. The wire instructions for two of the transfers listed the purpose of the transfer was for "campus ID" and the other transfer listed "UWM Tuition." In addition, the amounts are roughly consistent with the cost LIU was charging for his PEP.

23.     On or about August 21, 2017, LIU issued a check from UWIF account x3169 in the amount of $70,000 payable to Huixin. On or about September 21, 2017, LIU transferred $60,000 from UWIF account x3169 to the Huixin account x6573. On or about the same day, LIU then transferred $50,000 from account x6573 to his E*TRADE account x3264 to purchase investments.

24.     UWIF/WIE account x3169 at BMO Harris Bank had minimal activity from in or about November 2017 to in or about May 2018, when it was closed.

25.     In or about December 2017, WIE account x6573 at US Bank received four deposits totaling $126,160, consisting of checks from individual accounts at US Bank each in the amount of $31,540, roughly consistent with the cost LIU was charging for his PEP. On or about December 22, 2017, LIU transferred $24,500 from WIE account x6573 to an unknown bank account and $19,940 to his personal account x5723 at US Bank. On or about December 26, 2017, LIU transferred $44,000 from US Bank account x6573 to his personal account x5723 at US Bank. On or about December 27, 2017, LIU transferred $49,500 from US Bank account x5723 to fund EdVest, Capital One, and Fidelity investment accounts he controls.

26.     From in or about April 2018 to in or about May 2018, WIE account x6573 received five deposits totaling approximately $115,390, consisting of checks in amounts that ranged from $15,770 to $33,540, which are roughly consistent with the cost LIU was charging for his PEP. The memo line of the checks listed "tuition," "2018-2019 program fee," or the student's ID number.

27.     On or about May 29, 2018, LIU transferred $75,000 from US Bank account x6573 to US Bank account x5723. On or about May 30, 2018, LIU then transferred $100,000 from US Bank account x5723 to E*TRADE account x3264.

28.     From in or about June 2018 to in or about August 2018, WIE account x6573 received eight deposits totaling approximately $256,427, consisting of wire transfers originating from accounts held in China. The deposit amounts ranged from $29,558 to $33,555, which are roughly consistent with the cost LIU was charging for his PEP.

29.     On or about July 9, 2018, LIU transferred $100,000 from Fidelity account x9579 to US Bank account x5723. On or about July 10, 2018, LIU transferred $100,000 from account x5723 to E*TRADE account x3264.

30.     On or about July 26, 2018, LIU transferred $100,000 from US Bank account x6573 to US Bank account x5723. On or about July 27, 2018, LIU then transferred $100,000 from US Bank account x5723 to E*TRADE account x3264.

31.     From in or about November 2018 to in or about November 2019, WIE account x6573 received twelve deposits totaling $365,263.05 consisting of five checks and seven wire transfers. The deposit amounts ranged from $14,000 to $44,820, which are roughly consistent with the amounts LIU was charging for his PEP. On three of the checks, a student ID number was referenced in the memo line. Funds were then withdrawn from the account to fund, for example, approximately $31,700 to LIU's American Express account and $22,450 in school tuition for LIU's children.

32.     In 2020, no additional deposits were made into the WIE account x6573 that had the appearance of being derived from LIU's PEP.

6

33.     Each year from 2015 to 2020, UWM required LIU to complete an Outside Activities Disclosure for any outside remunerative relationship that results in payments, transfers of goods or provision of services.  LIU never disclosed his ownership in UWIF/WIE in any of the annual disclosure forms.  Based on my training and experience, and the investigation to date, I believe that the deposits into accounts x3169 at BMO Harris Bank and x6573 at US Bank consisted of payments from students for participation in LIU's PEP.

### FICTITIOUS AGREEMENT BETWEEN UWM AND PRECISION SYSTEMS, INC.

34.     The investigation and evidence obtained to date has revealed that LIU used a fake grant or agreement with UWM to justify having the Chinese students—who made payments to him for his PEP—serve as research assistants.

35.     In June 2016, UWM entered into a Sponsored Research Agreement ("SRA") with Precision Systems, Inc., a company purportedly with its principal place of business in Beijing, China ("PSI-China").  The executive summary described the project as follows:

> The Department of Civil Engineering in the College of Engineering and Applied Science and the Office of Sponsored Programs at the University of Wisconsin-Milwaukee have negotiated a Sponsored Research Agreement with Precision Systems, Inc., a Chinese company with specialization in highway infrastructure design and planning, traffic engineering, traffic control system design, traffic signal design, and street light design. Under this agreement, the University will engage with Precision Systems, Inc. to design, implement, and test a city-wide traffic work zone project management system for Washington, D.C.  The services will be provided over a period from June 1, 2016 through May 31, 2021.  Revenues to the University associated with such services are estimated to be $1,562,564.  The work will be overseen by Dr. Yue Liu in the Department of Civil Engineering.

36.     The individual who signed the SRA on behalf of PSI-China is Haiying Wang, who is LIU's mother.  She is listed as Senior Vice President, with an address at P.O. Box 907, Milwaukee, Wisconsin 53201.  This is the same address LIU used when he submitted to the Wisconsin DFI the name change for UWIEF.

37.     Precision Systems, Inc. is a company based out of Washington, D.C. ("PSI-DC"). According to the company's LinkedIn profile: "Precision Systems, Inc. has provided professional engineering services for nearly three decades.  Our team of professional engineers, planners, inspectors, software developers and researchers combine practical experience and state-of-the-art technology to solve day-to-day operational and design issues facing our transportation system and industry."  According to public records, PSI-DC is currently involved with an existing city-wide work zone project management system for Washington D.C., which was deployed in January 2016.

38.     In or about March 2021, the FBI interviewed a director at PSI-DC.  After initially stating that PSI-DC had never done work with UWM, the director confirmed that LIU was contracted to work with PSI-DC from March 2013 through December 2014 on a Citywide Work Zone Project Management System and earned approximately $38,000.  PSI-DC does not have

7

any current contract with LIU or UWM.  In addition, PSI-DC is not involved with the current $1.5 million SRA between UWM and PSI-China for a city-wide work zone project management system for Washington D.C.

39.     According to the SRA, invoices from UWM under the grant were to be issued to PSI-China at P.O. Box 907.  All the payments to UWM under the SRA, however, were made by WIE, Wang, and another entity connected to LIU.

40.     On July 8, 2017, LIU issued a check from UWIF account x3169 in the amount of $47,000 payable to Haiying Wang.  As discussed above, I am aware that Haiying Wang is the name of LIU's mother.  The check was deposited on July 14, 2017 into US Bank account x7865, which is also in Wang's name.  Wang then issued two checks from the account payable to the Board of Regents of University of Wisconsin System.  The checks were in the amounts of $23,430.87 and $23,152.89, and dated June 1, 2017 and June 15, 2017, respectively.  After signing both checks, Wang wrote next to her signature "on behalf of Precision Systems."  The checks were submitted to UWM to pay invoices related to the SRA with PSI-China.

41.     In or about January, July and October 2018, LIU issued three checks from WIE account x6573 totaling $174,662.38 to UWM to pay invoices related to the SRA with PSI-China created by LIU.

42.     From in or about December 2018 to in or about November 2019, funds were withdrawn from WIE account x6573 for approximately $54,000 to UWM for the PSI-China and other agreements.

43.     On or about July 24, 2019, LIU issued a check from US Bank account x6573 payable to UWM Foundation in the amount of $165,000.  In the memo line of the check was written "Fund #831900 Public Transit Research Fund."  The payment represented a donation to UWM on WIE's behalf.

44.     UWM communicated with PSI-China about the SRA by sending emails to, and receiving emails from, email account psi.sponsored.research@gmail.com.  According to subpoena results, that email account was created in or about April 2016 and is associated with the name Haiying Wang and phone number (617) 605-5911, which is used by LIU.

45.     Based on my training and experience, and the investigation to date, I believe that LIU set up the SRA between UWM and PSI-China to justify the research assistant  positions for the Chinese students, which benefited LIU financially because the students were making the payments discussed above to accounts that he controlled.  The SRA also benefitted him professionally.  LIU disclosed in his UWM employee activity report the SRA with an estimated project cost of $1,562,564.  UWM confirmed that it considered the SRA and the $1.5 million at the time LIU was seeking promotion to full Professor in 2017.

INTERVIEW OF LIU

46.     On or about July 7, 2021, your affiant and investigating agents from FBI and HSI interviewed LIU at his residence.  LIU was asked to explain his involvement with UWIF/WIE,

which he described as a "consulting" business he owns that assists international students with the application process, transportation, and lodging. LIU initially stated that his business was "small scale" and minimized the number of students/customers and profit. Specifically, he reported the numbers for the years below as approximately:

- 2016 – 2 students/customers and $8,000 profit;
- 2017 – 4 students/customers and $15,000 profit; and
- 2018 – 8 students/customers and $30,000 profit (double the prior year).

47.     LIU confirmed the name of the program offered by WIE was the PEP. LIU recalled providing students with a document about the PEP in earlier years, through 2017, but said he did not provide any documentation to students after 2018. LIU was shown a copy of the PEP document emailed to a prospective student, as discussed above. LIU admitted that he sent the document, which was signed by Ian Wyatt at WIE Foundation. LIU admitted that Ian Wyatt was a fictitious name, which he said he needed to use to gain the trust of the Chinese families. LIU said he would not be able to gain the trust of Chinese families if the document was signed by an individual with a Chinese name, so he used that name. LIU admitted that he had owned the P.O. Box listed on the PEP document. LIU stated that UWM was not aware he used the UWM logo on the letterhead. LIU admitted creating the document to convince the students and their families that they needed LIU's consulting services.

48.     During the interview, LIU was shown a summary of deposits into BMO Harris Bank account x3169, from April 2016 to August 2017. LIU confirmed that all the deposits (except for transfers from other accounts he controlled) on the summary were fees for his "consulting" business. These deposits total approximately $329,434.

49.     LIU was also shown a summary of deposits into US Bank account x6573, from December 2017 to November 2019. LIU again confirmed that all the deposits (except for one transfer from another account) on the summary were fees for his "consulting" business. These deposits total approximately $866,248.05.

50.     LIU admitted that seven smaller deposits on the summaries of deposits into BMO Harris Bank account x3169 and US Bank account x6573, ranging in amounts from $1,513 to $6,000, were fees he charged to visiting professors to come to UWM.

51.     The deposits that LIU admitted were fees for his "consulting" business total approximately $1,195,682.05. LIU claimed that from those funds he paid for the students' expenses at UWM. According to LIU, he would collect the funds from various students and then pay their combined expenses. LIU recalled issuing five to six checks in the amounts of approximately $30,000 to UWM for these expenses.

52.     When asked to explain how he was paying for the students' expenses at UWM, LIU stated he was paying for the expenses from the PSI-China grant. LIU initially stated the grant with PSI was "real," but had been suspended. When asked again later in the interview if the PSI grant was real, LIU admitted that it was not. He stated that no research was done under the grant. He admitted to using funds in the UWIF/WIE bank accounts to pay for expenses

relating to the PSI grant. When asked to explain the purpose of the grant, LIU stated that he did it to assist the students and for him to earn extra income. LIU further stated the purpose of the grant was not for "money laundering," but to assist students and to make "profit" for himself.

53.     LIU also admitted that he created the email account psi.sponsored.research@gmail.com to communicate with UWM regarding the grant. He stated that it would not look good for his name to be associated with communications from that account to UWM regarding the grant. LIU also admitted that he used the bank account in his mother's name to make payments to UWM regarding the grant.

54.     LIU stated throughout the interview that he was paying student expenses with the funds he received. LIU stated that UWM offers to students a "package" similar to his PEP. LIU saw an opportunity to offer his PEP program, which he claimed is a cheaper alternative for the students. LIU stated that he has an advantage working for UWM and knowing the cost structure for foreign students. LIU stated that UWM does not know that he operated the PEP and he has never disclosed it to UWM.

55.     When asked to estimate the total profit made from operating WIE, LIU estimated the profit to be approximately $650,000. This figure is roughly consistent with a review of the bank accounts, which show that he received approximately $1,195,682.05 from the students, paid back to UWM under the fake PSI-China and other grants approximately $337,651.84, and provided the donation to UWM of $165,000. LIU stated that he transferred the profit to an E*TRADE investment account.

56.     My review of the bank records did not reveal payments to UWM for the students' combined expenses, as LIU claimed. Instead, the payments to UWM were for invoices from UWM under the fake SRA with PSI-China. Those invoices included the salaries and fringe benefits for research assistants that LIU admitted did no research. Payments for tuition remission, as listed on those invoices, total just $39,355, for fifteen of the students.

### INTERVIEWS OF STUDENTS

57.     On or about July 19, 2021, your affiant and investigating agents from FBI and HSI interviewed Student #1 regarding funds paid to LIU. Student #1 had issued a check to UWIF from Student #1's personal bank in the amount of $33,540 in April 2017. This check was deposited into BMO Harris Bank account x3169. Student #1 believed the first payment was for tuition.

58.     Student #1 issued a second check to WIE from Student #1's personal bank in the amount of $15,770 in May 2018. The check was deposited into US Bank account x6573. For the second payment, LIU asked Student #1 to come into his office at UWM. LIU had Student #1 close the door because two other students were waiting outside LIU's office. LIU requested that Student #1 make an additional payment for tuition expenses. Student #1 was confused since he was a research assistant / teaching assistant, which he knew by then would allow him to have tuition waived at UWM. Student #1 never received any documents or receipts for payments made to LIU. In addition, LIU never paid for any transportation, meals, expenses, or housing for Student #1.

59.     On or about July 19, 2021, your affiant and investigating agents from FBI and HSI interviewed Student #2 regarding funds paid to LIU.  Student #2 had wired $31,565 into BMO Harris Bank account x3169 in June 2017 and $29,558 into US Bank account x6573 in August 2018.  Student #2 had met with LIU in his office at UWM to discuss the program and the cost.  Student #2 recalled receiving an email with a UWM header from LIU with details on how to remit payment to WIE.  Student #2 believed LIU's program was affiliated with UWM.

60.     Student #2 met with other PhD students who had never paid the program fee to LIU.  Also, Student #2 knew that research assistants and teaching assistants did not need to pay tuition.  Student #2 questioned LIU on the need for the WIE payment.  Student #2 did not recall the specific conversation but stated LIU was convincing in his discussion about the necessity of being involved in the program.

61.     Student #2 has never heard of the PSI-China grant.  Nonetheless, in review of the expenses billed to PSI-China by UWM on the grant, Student #2's name was used to bill $12,539.97.

62.     On or about August 3, 2021, your affiant and investigating agents from FBI and HSI interviewed Student #3 regarding funds paid to LIU.  Student #3 met LIU in 2015 during a presentation LIU gave to students at Shanghai University.  LIU's presentation was regarding a two-degree program (Masters/Ph.D) at UWM.  LIU told the students the cost of the program was approximately $30,000 which includes tuition, health insurance, and a stipend for living expenses.  Student #3 paid $31,540 to UWIF by check on April 13, 2017.

63.     Student #3 was asked to make a second payment in May 2018.  Student #3 met with LIU in his office at UWM to discuss the payment.  Student #3 questioned LIU about the cost of the program.  LIU explained to Student #3 that the department had limited resources and the funds were needed to fund the increase in health insurance costs of the program.  Later that same day, LIU had a follow up conversation with Student #3 with Student #1 present during an online chat.  LIU again reiterated that the department had limited resources and needed the funds to pay for increased health insurance costs.  After the meeting, Student #3 stated that Student #1 was suspicious of the payments to LIU.  Student #1 conducted internet searches and told Student #3 that UWIF and WIE are business controlled by LIU.  Student #3 subsequently issued a check to WIE for $15,770 on May 16, 2018.

IV.     CONCLUSION

64.     Based on the above, I believe that the funds received by LIU were not for any legitimate purpose related to education activities.  Instead, it appears LIU used the funds to benefit himself.  From March 2016 to December 2020, LIU received proceeds of approximately $1,195,682.05 into BMO Harris x3169 and US Bank account x6573.  LIU then "layered" the proceeds by depositing the funds into a personal bank account x5723 at US Bank and then into a brokerage account x3264 at E*TRADE to conceal and disguise the original source of the funds.  The total of the funds transferred to E*TRADE x3264 as described above is approximately $405,224.

65.     I further submit that LIU's deposit of $405,224 into E\*TRADE x3264 account constitutes a violation of 18 U.S.C. § 1957 in that: (1) the deposits were a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from wire fraud, in violation of 18 U.S.C. § 1343, which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7); and (4) each purchase transaction occurred in the United States.

66.     For these reasons, I submit that there exists probable cause to believe that up to $405,224 in funds on deposit in an account at E\*TRADE x3264 are:

     a.  subject to civil and criminal forfeiture, under 18 U.S.C. §§ 981(a)(l)(A) and 982(a)(1), as funds involved in or traceable to money laundering offenses, committed in violation of 18 U.S.C. § 1957;

     b.  subject to civil and criminal forfeiture, under 18 U.S.C. § 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and 28 U.S.C. § 2461(c), as property that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343; and

     c.  subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(l) and 21 U.S.C. § 853(f).